UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

WILLIAM BOURBONNAIS, et al.,

    Plaintiffs,

v.     Case No. 14-C-966

AMERIPRISE FINANCIAL SERVICES INC., et al.,

    Defendants.

## DECISION AND ORDER

Plaintiffs William Bourbonnais and Thomas and Donna Tesch filed this class action suit for securities fraud against Paul Renard, their former financial advisor, and the two broker-dealers with whom Renard was registered during the allegedly fraudulent transactions, Ameriprise Financial Services, Inc. (Ameriprise), and SII Investments, Inc. (SII). Plaintiffs' complaint asserts that the defendants sold them and the class members securities they knew to be unsuited for their needs and goals in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder. The complaint also asserts several related state law claims of negligence and violations of the Wisconsin Uniform Securities Law, Wis. Stats. § 551.501(2), and the Wisconsin Organized Crime Control Act, § 946.80 *et seq*. The case is before the court on the defendants' motions to dismiss the complaint for failure to state a claim. Defendants also move to strike the class allegations and compel arbitration. For the reasons that follow, the motion to dismiss will be granted with leave to plead over.

## BACKGROUND

Plaintiffs describe themselves and the class they seek to represent as "ordinary people – retail investors as the industry calls them – whose accounts were not marked as having a speculative risk tolerance." (ECF No. 1, ¶ 3.) Despite this fact, the complaint alleges that the defendants sold them non-traditional leveraged and inverse exchange-traded funds (ETFs). According to the complaint, traditional ETFs are funds that track indexes like the NASDAQ-100 Index, S&P 500, Dow Jones Industrial Average, and so forth. Traditional ETFs "don't try to beat the market, they try to be the market." (*Id.* ¶ 13.) Non-traditional ETFs, on the other hand, are leveraged or inverse ETFs that seek to deliver multiples of the daily performance of the index or benchmark they track. "For example, a non-traditional ETF may seek results that correspond to two times the inverse of the daily performance of the S&P 500, meaning the leveraged inverse ETF seeks to deliver twice the opposite of the S&P 500's daily performance." (*Id.* ¶ 17.) Most non-traditional ETFs "reset" daily, meaning the ETF does not seek to achieve its stated investment objective over a period of time greater than a single day. According to the Financial Industry Regulatory Authority's (FINRA) Regulatory Notice 09-31, non-traditional ETFs are typically unsuitable for retail investors who plan to hold them for longer than one trading session, particularly in volatile markets. (*Id.* ¶ 24.)

Paul Renard, the registered agent for the transactions at issue, was registered at SII from 1998 to August 2009 and again from August 2011 to August 2013. He was registered at Ameriprise in the interim. The complaint alleges that Renard, while registered at SII in 2009, sold Plaintiff Bourbonnais $105,389.81 of Direxion Daily S&P 500 Bear 3x Shares (BGZ/SPXS), a non-traditional ETF, which Bourbonnais held for more than four years. (*Id.* ¶ 41.) While registered at Ameriprise in 2010, Renard sold Bourbonnais an additional $165,905.00 of BGZ/SPXS, which

Bourbonnais held for more than three years. (*Id.* ¶ 44.) And in 2011, after being terminated from Ameriprise and returning to SII, Renard sold Bourbonnais $102,269.50 of another non-traditional ETF called ProShares Short S&P 500 (SH), which he held for more than two years. (*Id.* ¶ 48.) The complaint also alleges Renard sold Plaintiffs Thomas and Donna Tesch $152,798.62 and then another $75,826.63 of BGZ/SPXS, which the Teschs held for more than three years, while Renard was registered at Ameriprise in 2010. (*Id.* ¶ 53.) The complaint alleges Bourbonnais wound up losing 89% of his investment in BGZ/SPXS and 31% of his investment in SH. (*Id.* ¶¶ 47, 51.) The Teschs lost 90% of their investment in BGZ/SPXS. (*Id.* ¶ 56.)

According to a Letter of Acceptance, Waiver and Consent signed by Renard and FINRA, which is attached to and referred to in the complaint, Renard recommended at least four of his customers buy and hold non-traditional ETFs without having reasonable grounds for believing that the recommended investments were suitable for those customers. (ECF No. 1-2 at 1.) In addition, because Ameriprise had a policy prohibiting the solicitation of non-traditional ETF transactions, Renard falsely indicated on the order ticket that the sales were "unsolicited" in many of his transactions. (*Id.* at 1–2.) By June 2011, at which time Amerprise terminated its relationship with Renard, some of Renard's customers had been holding non-traditional ETFs for more than 600 days. (*Id.* at 2.) The complaint also quotes various pleadings and arguments made in the arbitration proceedings over Renard's termination by Ameriprise, as well as the proceedings that took place in federal court when Renard filed a motion to vacate the adverse arbitration award. For example, the complaint alleges that Ameriprise "expressly admitted" in those proceedings that Renard committed clear violations of securities laws and rules and defrauded his clients. (ECF No. 1, ¶ 64.)

3

The complaint alleges Ameriprise, despite its policy mentioned above, was reckless in failing to maintain a system to ensure Plaintiffs and the class were properly advised of the suitability of their investments. (*Id.* ¶ 60.) The complaint alleges Ameriprise knew Renard sold non-traditional ETFs prior to hiring him, and it alleges that Renard testified in the arbitration proceedings that other Ameriprise employees encouraged him to sell non-traditional ETFs and to fraudulently mismark order tickets to circumvent Ameriprise's policy. (*Id.* ¶¶ 69, 70.) The complaint also alleges that regardless of whether the orders were falsified, the sheer number of "unsolicited" sales of non-traditional ETFs to individual retail investors was a "red flag" indicating unsuitable sales that Ameriprise recklessly disregarded. (*Id.* ¶ 73.) Finally, the complaint alleges that even after Ameriprise discovered Renard's fraud and fired him, the company failed to advise Plaintiffs and the class of the unsuitable investments they were holding, resulting in further damages to investors. (*Id.* ¶ 75.)

The complaint alleges SII was also reckless for failing to maintain or even establish a system for ensuring Plaintiffs and the class were properly advised of the suitability of their investments. (*Id.* ¶¶ 81–82.) It alleges SII knew Plaintiffs and the class were holding unsuitable investments and losing money, yet it failed to advise the investors that the products were unsuitable for them. (*Id.* ¶ 84.) Despite knowing Renard was fired by Ameriprise and sanctioned by FINRA, the complaint alleges SII recklessly re-hired Renard and allowed him to continue recommending and selling unsuitable investments to Plaintiffs and the class. (*Id.* ¶ 85.)

The complaint also defines the proposed class as all individuals who (1) were retail clients of Ameriprise or SII; (2) purchased non-traditional ETFs that reset daily; (3) held the non-traditional ETFs for 21 days or more; and (4) did not have accounts marked for speculative risk tolerance. (*Id.*

4

¶ 92.) It further defines two similar sub-classes consistent with the above but limited to clients of Renard's while at Ameriprise and clients or Renard's while at SII. (*See id.*)

## ANALYSIS

Renard moves to dismiss Count I for failure to state a claim upon which relief may be granted. Fed.R.Civ.P. 12(b)(6). In reviewing a motion under Rule 12(b)(6), the court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiffs. *Pugh v. Tribune Co.*, 521 F.3d 686, 692 (7th Cir. 2008). The complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed.R.Civ.P. 8(a). In addition, a securities fraud claim must meet the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b)(1), (2).

Rule 9(b) of the Federal Rules of Civil Procedure provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." In *Borsellino v. Goldman Sachs Group, Inc.*, the court explained the rationale for the heightened pleading requirement in cases alleging fraud:

> This heightened pleading requirement is a response to the great harm to the reputation of a business firm or other enterprise a fraud claim can do. . . . Thus, a plaintiff claiming fraud or mistake must do more pre-complaint investigation to assure that the claim is responsible and supported, rather than defamatory and extortionate. A complaint alleging fraud must provide "the who, what, when, where, and how."

477 F.3d 502, 507 (7th Cir. 2007) (internal quotations and citations omitted); *see also Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir.1999).

5

The PSLRA raises the pleading burden even higher. For any materially false statement or omission alleged, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA also requires the complaint "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A) (emphasis added).

Plaintiffs have asserted what some courts have referred to as a § 10(b) unsuitability claim against the defendants. *See, e.g., Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1031 (2d Cir. 1993); *O'Connor v. R.F. Lafferty & Co., Inc.*, 965 F.2d 893, 897 (10th Cir.1992). To state an unsuitability claim, a plaintiff must allege:

> (1) that the securities purchased were unsuited to the buyer's needs; (2) that the defendant knew or reasonably believed the securities were unsuited to the buyer's needs; (3) that the defendant recommended or purchased the unsuitable securities for the buyer anyway; (4) that, with scienter, the defendant made material misrepresentations (or, owing a duty to the buyer, failed to disclose material information) relating to the suitability of the securities; and (5) that the buyer justifiably relied to its detriment on the defendant's fraudulent conduct. Scienter may be inferred by finding that the defendant knew or reasonably believed that the securities were unsuited to the investor's needs, misrepresented or failed to disclose the unsuitability of the securities, and proceeded to recommend or purchase the securities anyway.

*Brown v. E.F. Hutton Group, Inc.*, 991 F.2d at 1031.

"Analytically, an unsuitability claim is a subset of the ordinary § 10(b) fraud claim in which a plaintiff must allege, *inter alia*, (1) material misstatements or omissions, (2) indicating an intent to deceive or defraud, (3) in connection with the purchase or sale of a security." *Id.* at 1031; *see also Louros v. Kreicas*, 367 F.Supp.2d 572, 586 (S.D.N.Y. 2005) ("An unsuitability claim, then, is similar

6

to an ordinary Section 10(b) fraud claim, except that the unsuitability claim requires (a) proof of the knowing purchase or recommendation of unsuitable securities, and (b) that the misrepresentations and omissions in question relate to the suitability of the securities, rather than that they be in connection with their purchase or sale.").

Plaintiffs' complaint describes, with supporting references to FINRA publications, the unsuitable nature of the non-traditional ETFs for so-called retail investors with relatively low risk tolerance and identifies the named Plaintiffs as just such investors. The complaint describes each of the sales of non-traditional ETFs to the named Plaintiffs by SII or Ameriprise, the dates of each transaction and alleges that Renard was the registered representative for each of the transactions. Absent from the complaint, however, are any particularized allegations as to the who, what, when, where, and how of the fraud as to them. Although the complaint alleges generally that Renard was terminated by Ameriprise and sanctioned by FINRA for recommending non-traditional ETFs to clients for whom such an investment was unsuited, there is no allegation that Renard made any such recommendation, either orally or in writing, to the named Plaintiffs. There is no allegation of what he failed to tell them and what he said that made the omission misleading. Also missing are any allegations as to when the false representations or omissions were made. Indeed, there isn't even a particularized allegation as to what Renard omitted in his presentation to the named Plaintiffs.

To be sure, "the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir.2011). While a plaintiff claiming fraud is required "to fill in a fairly specific picture of the allegations in her complaint, we 'remain sensitive to information asymmetries that may prevent a plaintiff from offering more detail.'" *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 949 (7th Cir. 2013) (quoting *Pirelli*

7

*Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011)). But this is not a case in which the named Plaintiffs lack access to the information needed to meet the particularity standard. Plaintiffs must know what Renard did and did not tell them about the non-traditional ETFs before they invested in them. Instead of allegations of what Renard specifically said to the Plaintiffs, the complaint relies on the allegations by Ameriprise and the findings of FINRA that Renard recommended non-traditional ETFs to his clients in general. But the fact that Renard may have recommended non-traditional ETFs to some of his retail clients without explaining the risk and dangers associated with them does not mean he recommended them to the named Plaintiffs. The complaint contains only conclusory allegations that the defendants knowingly or in reckless disregard of their duties failed to communicate material information to Plaintiffs regarding the purchase of non-traditional ETFs, and thereafter continued to remain silent despite the evidence that their earlier omissions and reckless conduct was continuing to cause Plaintiffs economic loss. (ECF No. 1, ¶¶ 104, 105, 106.) This is not enough. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation.") (internal quotation marks omitted).

In truth, Plaintiffs do not really dispute the defendants' assertion that the complaint fails to identify individual omissions or misrepresentations with particularity. Instead, they argue that they are justified in avoiding the required specificity so as to preserve their argument for certification as a class action. In response to Ameriprise's contention that their complaint lacks the required particularity, Plaintiffs contend, "Ameriprise ignores how this is a class action, and 'to satisfy the pleading requirements of the PSLRA and still be able to pursue their claims as a class,' Plaintiffs

8

must plead 'facts demonstrating that [the broker-dealer] engaged in a *scheme to defraud its investors.*'" (Pl.'s Resp. To Def. Ameriprise Mot. To Dismiss at 11–12 (quoting *Clemens Trust*, 485 F.3d at 850)). The fact that Plaintiffs want to bring a class action, however, does not relieve them of the obligation to comply with Rule 9(b) even if in doing so they undermine their request for class certification.

For these reasons, Plaintiffs' § 10(b) securities fraud claim will be dismissed. And because the remaining claims arise under state law, they will be dismissed also for lack of federal jurisdiction. *See* 28 U.S.C. § 1367(c)(3). The dismissals are without prejudice, however, and Plaintiffs may re-file an amended complaint within 30 days. It appears clear that Plaintiffs will be able to state a § 10(b) claim with the required particularity directly against at least Renard and perhaps under principles of respondeat superior or apparent authority against Ameriprise and SII. Of course, if a § 10(b) claim is asserted, the court will have supplemental jurisdiction over Plaintiffs' state law claims. The motions for class certification and to strike the class allegations are denied as moot.

**SO ORDERED** at Green Bay, Wisconsin this  24th  day of February, 2015.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court